UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

LAKELAND HARBOR SPE LLC and )
HOMETOWN AMERICA MANAGEMENT, LLC, )
                                  )
        Plaintiffs,               )
                                  )
v.                                )
                                  )
TOWN OF ROCKLAND RENT CONTROL     )    CIVIL ACTION NO.
BOARD,                            )    08-11651-DPW
                                  )
        Defendant,                )
                                  )
and                               )
                                  )
LEISUREWOODS HOMEOWNERS           )
ASSOCIATION, INC.,                )
                                  )
        Defendant-Intervenor.     )

MEMORANDUM AND ORDER
March 5, 2010

The Plaintiffs, Lakeland Harbor SPE LLC and Hometown America

Management, LLC (collectively "Hometown"), seek this Court's

review under MASS. GEN. LAWS ch. 30A, § 14, of a decision made by

the Rent Control Board ("Board") of the Town of Rockland.

Hometown had petitioned the Board for an increase in the rents

charged to residents of the Leisurewoods-Rockland manufactured

housing community ("Leisurewoods" or "Property").  The Board

approved a rent adjustment, but declined to adopt Hometown's

proposed methodology for calculating the adjustment.  Hometown

now challenges three aspects of the Board's decision: its choice

of methodology in determining the appropriate rent increase; its

application of the methodology it chose; and its treatment of capital expenditures in the rent increase calculations.  Hometown also requests that this Court remand the matter to the Board so that Hometown can present additional evidence on these issues. For the reasons set forth more fully below, I deny Plaintiffs' motion to present additional evidence to the Board and, upon judicial review of the administrative record, affirm the Board's decision.

## I.  BACKGROUND

Leisurewoods is a manufactured housing community for residents over the age of 55, and consists of 392 rented spaces occupied by tenant-owned mobile homes.  The Property is a gated community with evening security patrols, and has a clubhouse and a swimming pool.  (Administrative Record ("AR") 00226-228.) Hometown acquired the Property in 2003.

### A.  *The 1991 and 1996 Settlement Agreements*

At the time of Hometown's purchase of the Property, 285 of the 392 units were subject to long-term leases that arose out of settlement agreements in 1991 and 1996 between the tenants and the Property's prior owner.  (AR 00351-71.)  The 1991 settlement agreement mandated that rents for existing residents in these long-term leases could only be increased by the change in the Consumer Price Index ("CPI") plus a property tax "pass through" and rents for new residents could be increased by the change in

-2-

the CPI plus 2 percent and for increases in tax and license fees. The 1996 settlement agreement did not materially alter the terms regarding rent increases.  Under these agreements, Hometown could raise the rents to the prevailing market rents once a space was vacated by the tenant.  (AR 00364-65.)  As a result, the rents paid within the Property ranged considerably, depending on how long the tenant had been renting the unit.  In 2006, before the Town of Rockland passed its rent control bylaw, the rent for vacant spaces in the Property was $515 per space.  (AR 00290.)

**B.  *Rockland's Rent Control Law***

Rockland adopted the Mobile Home Park Rent and Eviction Control By-law ("By-law") in 2006.  The By-law provides that "[t]he maximum rent of a controlled mobile home park accommodation shall be the rent charged on the effective date of this By-law."  (AR 00005.)  The Board could, upon petition by a park owner, adjust the maximum rent "as may be necessary to assure that rents are established at levels which yield to park owners a fair net operating income."  (AR 00005.)  When determining whether the park owners yield a "fair net operating income" ("FNOI"), the Board must consider, "among other relevant factors," the following factors: "(1) increases or decreases in property taxes; (2) unavoidable increases or any decreases in operating and maintenance expenses; (3) capital improvements of the mobile home park as distinguished from ordinary repair,

-3-

replacement and maintenance; (4) increases or decreases in space, services, and equipment, etc.; (5) substantial deterioration of the mobile home park other than as a result or ordinary wear or tear; and (6) failure to perform ordinary repair, replacement and maintenance."  (AR 00006.)

The By-Law incorporates MASS. GEN. LAWS ch. 30A, §§ 1 *et seq*. ("Chapter 30A"), the provisions of which are to apply to the Board "as if said rent board were an agency of the commonwealth." (AR 00007.)  The By-law also provides for the creation of a "Rent Control Board," consisting of seven members: two representing the landlords; two representing the tenants; and three representing the public interest.  (AR 00004.)  Among the Board's responsibilities is the adjudication of a park owner's petition for an adjustment of rent for its tenants.

The Rent Control Board subsequently adopted its Rules and Regulations for Manufactured Housing Community Accommodations, Rents and Evictions ("Regulations") to regulate the rents, standards, and evictions in Rockland's mobile home parks.  (AR 00013-21.)  The Regulations define the FNOI to mean "that level of net income (i.e., profit) which is adequate to provide the Owner with a reasonable return on its investment."  (AR 00014.) In determining whether to make an adjustment in the maximum rent levels, "the Board will presume that the total Rents for a MHC [manufactured housing community] that were in effect as of the

-4-

effective date of this By-Law were adequate, at that time, to provide the Owner with a Fair Net Operating Income." (*Id.*)  The Regulations reiterate the six factors identified in the By-law as those relevant to determining the FNOI, but the Regulations also provide that the Board "shall evaluate all evidence presented by any party" regarding the FNOI.  (*Id.*)

The procedure for adjudicating a rental adjustment petition is set out in Section 5 of the Regulations.  The Board must hold a public hearing, the purpose of which is "for the Board to be duly informed of the facts pertaining to the application or petition." (AR 00017.)  The Chairperson shall close the public hearing once satisfied that the petitioner and members of the public have had a full opportunity to present information relevant to the Board's determination.  (AR 00018.)  After the hearing, the Board has forty days to make a decision.  (*Id.*)

## C.  *Hometown's Rent Adjustment Petition*

Hometown filed a petition for a rent adjustment on April 21, 2008.[1]  The petition requested an increase for 2008, but also a retroactive increase in the rents that had been charged in 2007.[2]

---

[1] Hometown had apparently requested a rent adjustment in 2006, but the request could not be heard because the Town of Rockland had not yet created a Rent Control Board, or the Board's rules and regulations.  (AR 00167.)

[2] Because the absence of a functional Rent Control Board precluded Hometown from petitioning for those increases before residents paid the 2007 rent, Hometown asked that these amounts "in arrears" be charged to the tenants retroactively.  (AR 00037.)

(AR 00037-38.)  Under the petition, the tenants could pay the total amount in arrears either in a one-time additional payment, or in six monthly installments.  (AR 00039.)

Hometown's proposed formula for calculating rent increases was based on the park owner's total rental revenues, rather than its net profits after deducting operating expenses.  (AR 00037.) Although Hometown's petition included a table summarizing its net operating income ("NOI"), the NOI does not appear in Hometown's rent adjustment formula.  (AR 00043.)  The proposed rent increases for 2007 were calculated by taking Hometown's gross income in 2006, and multiplying that figure by 2.1 percent, which was the CPI increase in the Greater Boston Area from November 2005 to November 2006.  (AR 00037.)  The total increase in rental income would then be $43,711.68, which Hometown proposed to apply to the tenants' monthly rents on a regressive basis, whereby tenants who paid lower rents (due to the 1991 settlement agreement) would receive a higher rent increase.[3]  (*Id*.)  The rationale for this distribution was purportedly that the tenants paying market rents resented the disparity caused by the 1991 settlement agreement, and a regressive rent increase would eventually close the gap.

---

[3] Those paying $515 a month would get no increase; those paying between $500 and $515 a month would have their rents increased to $515; and those paying between $305 and $500 would have their rents increased by $12.37 per month.  (AR 00037.)

Hometown's proposed rent increases for 2008 were calculated by multiplying Hometown's income (again, not defined) by 3.4 percent, which was the Greater Boston Area CPI from November 2006 to November 2007.  (AR 00038.)  The income in that formula was based not on Hometown's actual rental income in 2007, but rather on what Hometown's rental income would be for 2007 if the Board approved Hometown's 2007 rent increase.[4]  (*Id.*)  The total increase would then be $72,258.96, which, like the 2007 increases, would be distributed to the tenants on a regressive basis.[5]  (*Id.*)

Hometown's proposal also included a rent increase for a property tax pass-through (AR 00037-38), whereby the property taxes for 2007 and 2008 would be charged to the tenants through a rent increase.  In addition, Hometown proposed that future rent increases, beginning February 1, 2009, would be determined by multiplying the Property's rent revenue by the Greater Boston Area CPI.  (AR 00039.)  The petition makes no request for a rent adjustment based on Hometown's capital improvements.

---

[4] Hometown's rental income chart lists its monthly rental income under the 2007 proposed rents as $177,704.75.  (AR 00054.)  Over the course of the year, the total rental income for 2007, with the requested adjustments, would be $2,132,457.00, the same figure used in Hometown's rent increase calculations for 2008.  (AR 00038.)

[5] Those paying $515 after the 2007 adjustment would have no increase; those paying between $482.07 and $515 would have their rent increased to $515; and those paying between $305 and $482.06 would have their rent increased by $21.94 per month.  (AR 00038.)

**D.   *The Board's Adjudicatory Proceedings***

The Board began its adjudication of Hometown's petition with public evidentiary hearings in June 2008, followed by Board deliberations that were also open to the public.

1.   Evidentiary Hearings

On June 3 and 4, 2008, the Rent Control Board held public evidentiary hearings on Hometown's petition for a rent adjustment.  The hearings involved a presentation from Hometown's attorney; a presentation from David Adams, attorney for the Leisurewoods Homeowners Association ("Association"), and comments from the public, who were invited to attend and participate in the proceedings.

During Hometown's presentation, its petition for a rent adjustment was admitted into evidence.  The petition included Hometown's CPI-based formula as well as the specific figures for Hometown's rental revenue, operating expenses, and capital expenditures.  (AR 00022-137; 00211-12.)  Michael Reed ("Reed"), the manager of the Property as well as a member of the Board, testified for Hometown.  His testimony addressed the leases of the Property's tenants, operating expenses, staff numbers and salaries, CPI increases, and the 1991 and 1996 settlement agreements.  (AR 00220-66.)  Members of the Board questioned Reed about particular operating expenses (AR 00397-411), but did not question him on Hometown's CPI formula or choice of methodology

-8-

in determining the appropriate rental increase.

The evidentiary hearing included statements and questions from Leisurewoods residents, but these were focused primarily on the burdens of rent increases more generally, and on how an increase would be distributed among the tenants.  No comments were made about Hometown's proposed formula, or the standards set out in the By-law and Regulations.

### 2.   Board Meetings

The Board met on June 12, 2008, to discuss Hometown's petition, the evidence, and the comments made at the evidentiary hearings held on June 3 and 4.  At this meeting, the counsel for the Town, John Goldrosen ("Town Counsel"), outlined the terms of the By-law and the Board's Regulations on the issue of rent adjustments.  At the outset of the meeting, the Town Counsel expressed his view of the proper method for calculating a rent adjustment:

> The bylaw and the regulations state that fair net [operating income] . . . is basically . . . the profits that the park owner was making before there was rent control, the assumption being that was a market rate situation. . . . If you deduct the operating expenses from the rental income, you get the net operating income. . . . Now in other cases, it's up to the board whether there's some adjustment that should be made from year to year in what is considered fair net operating income. The argument being that if somebody makes $1 today and they're told to preserve that level of profit, $1 a year from now is not worth the same as $1 today so you may want to make an adjustment in the profit amount based on some adjustment [such as] inflation or the increase in the cost of living.

(AR 00566-567.)

In other words, the Town Counsel's reading of the By-law and the Regulations was that the FNOI was determined first by calculating the park owner's NOI at the time rent control was instituted, subtracting operating expenses from rental revenue, and then maintaining that level of profit (or NOI) over time, with possible upward adjustments, such as for inflation.  The Board continued its deliberations essentially adopting, without discussion, this reading of the By-law and the Board's Regulations.  The Board never explicitly addressed Hometown's proposed formula using total rental revenue, rather than NOI, as the basis for a rent adjustment.  The remainder of the Board's meetings focused on calculating Hometown's operating expenses, by looking at the income and expense statements for 2006 and 2007.

The Board also discussed Hometown's capital expenditures in 2006 and 2007.  (AR 00628-633.)  There was apparently some confusion as to whether capital expenditures should be included in Hometown's operating expenses, whether they were non-operating expenses that should nonetheless be deducted from revenue in calculating NOI, or whether they should be disregarded for purposes of NOI calculation.  At one point, the Town Counsel suggested that the park owner could be compensated for the capital improvements made on the property.  He stated that the "landlord could come in and ask for [capital expenditures] separately," because the Board's Regulations provide "a mechanism

to get pre-approval when there's a large expense." (AR 00629-
630.) Reed replied that, in any event, even if the park had a
NOI and an additional capital expense, it would still be "going
to come out to six in one half dozen or the other." (AR 00630.)

The Board continued its discussions at its next Board
meeting on June 18, 2008. The Board subtracted Hometown's
operating expenses from Hometown's rental income, calculating its
2006 NOI. The 2006 NOI was calculated at that meeting to be
approximately $1.34 million. (AR 00708.) This 2006 NOI figure
included capital improvements. (*Id.*) Town Counsel described the
2007 NOI figure as the amount "considered to be the fair net
operating income for the base year," stating further that "the
procedure that most towns do is say, okay, we're going to
preserve that NOI going forward." (AR 00708-709.) The Board
then proceeded to calculate Hometown's 2007 FNOI, on the
assumption that Hometown's profits should be maintained at the
level of the 2006 NOI, as adjusted by the CPI. The 2007 FNOI was
calculated by multiplying the 2006 NOI by 2.1 percent (AR 00712-
713); the 2008 FNOI was calculated by multiplying the 2007 FNOI
by 3.4 percent. (AR 00720.) Much of the remainder of the
meeting was spent discussing the distribution of the rent
adjustment (whether the tenants should pay different amounts,
depending on their current payments), the issue of arrearage
(i.e., the 2007 increases that were going into effect

-11-

retroactively), what new Leisurewoods tenants would pay, and how rents would be charged in 2009.

At the next meeting, on June 30, 2008, Reed told the Board that it had employed a rent adjustment formula different from the one proposed by Hometown, and that it had done so without the appropriate evidence before it.  Reed also stated that the Board's treatment of capital expenditures was inappropriate, and created a disincentive for owners of rent-controlled property to make improvements.  Consequently, Reed moved to reopen the evidentiary hearings of June 3 and 4, 2008, for the presentation of evidence on these issues.  Board members and the Town Counsel found that Reed's concerns did not require the introduction of new evidence, but rather entailed further legal argument on how the Board should calculate Hometown's FNOI.  The Board therefore denied Reed's motion, but decided to allow Hometown and the Association to submit legal briefs on the issues of FNOI calculation and the treatment of capital expenditures. (AR 00832, 00846.)

On August 12, 2008, the Board discussed the legal memoranda submitted by Hometown and the Association.  Hometown argued that the Board had chosen to consider a Maintenance of Net Operating Income ("MNOI") methodology at its first board meeting, without notice to the parties.  The MNOI methodology, according to Hometown, identifies a base year, calculates a NOI for that base

year, and then maintains that NOI for future years, subject only to adjustments for inflation.[6]  (AR 00883.)

Hometown argued that the MNOI methodology was not required under the By-law or the Regulations.  But Hometown further maintained that if the Board wanted to adopt this methodology, it did so incorrectly, and Hometown should have the opportunity to present evidence of what it considered to be the appropriate calculation of MNOI.  (AR 00886-889.)  Specifically, Hometown alleged that the rents charged in 2006 were not market rate rents, because many of the units charged artificially low rates due to the 1991 settlement agreement.  The Board therefore could not assume that Hometown's NOI in 2006 was based on free market rates, yielding a FNOI.  (AR 00889.)

Town Counsel responded that, with respect to the proper method for determining the FNOI, he did not agree with Hometown's reading of the By-law and Regulations.  The calculation of Hometown's NOI in 2006, and the maintenance of that NOI over time, he contended, was the appropriate application of the By-law.  (AR 00938-939.)  Town Counsel also corrected some of the calculations of NOI made in the previous Board meeting.  (AR 00933-937.)  Some of these corrections involved capital expenditures.  The previous proposal had included a deduction for

_____

[6] In its legal brief submitted before the August 12, 2008 meeting, Hometown refers to the methodology as the "FNOI methodology."  (AR 00883.)

the full amount of the capital expenditures; Town Counsel
replaced this with an annual depreciation for capital
improvements.  (AR 00934.)

The Board engaged in little discussion of the differing
views on which formula, Town Counsel's or Hometown's, should be
used.  The Board ultimately adopted Town Counsel's view and
determined Hometown's FNOI based on the method they had
discussed: calculating the NOI in 2006, and maintaining that
amount over time as adjusted by the Greater Boston Area CPI.
(AR 01060-1062.)

   3.   The Board's Final Decision

On August 19, 2008, the Board issued its final decision on
Hometown's petition.  (AR 01080-88.)  The decision included a
section titled "Method for Determination of Rent Adjustment,"
which provided a step-by-step summary of its method for
determining Hometown's rent increases.  (AR 01081.)

      a.  2007 FNOI

The Board first determined the NOI for 2006 by calculating
the difference between rental income and allowable operating
expenses, plus an allowance for depreciation on capital
improvements.  This resulting figure, $1,410,570, "was presumed
to be the FNOI for the Property for 2006."  (AR 01081, 01083.)
The Board then calculated the 2007 NOI in the same manner.  The
FNOI for 2007 was calculated by multiplying the 2006 FNOI by 2.1

-14-

percent (the CPI for 2006), which was computed to be $1,440,192.
Because the 2007 FNOI was greater than the 2007 NOI, the Board
granted a rent adjustment of $40,348.  (AR 01084.)

### b.  2008 FNOI

The Board then determined the 2008 FNOI by multiplying the
2007 FNOI by 3.4 percent (the CPI for 2007).  (AR 01085.)  It
calculated the projected 2008 NOI by taking the 2007 NOI,
adjusting it by an allowance for depreciation on capital
improvements to be made in 2008.  The 2008 FNOI was calculated to
be $1,489,159.  Because the 2008 FNOI was greater than the
projected 2008 NOI, the Board granted a 2008 rent adjustment of
$95,488.  (AR 01082, 01086.)

### c.  Vacancies and New Tenants

Under the rent control system, once a rent-controlled unit
was vacated by a tenant, the new tenant could be charged the
maximum rent.  This turnover would produce income for Hometown
that was not included in the current or projected income figures.
The Board decided not to offset Hometown's total rent adjustment
by the additional rental income that Hometown would receive from
this turnover.  (AR 01082.)

The Board also determined that the maximum rent chargeable
to new tenants, as of August 1, 2008, should be increased by 5.5
percent (the sum of the CPI increases in 2006 and 2007).
(AR 01083.)

### d. *Distribution and Payments*

The Board decided to allocate the total rent adjustment equally among the 392 tenants, irrespective of the level of their monthly rental payments.  (AR 01082.)  The Board also decided that the amount in arrears could either be paid in a lump sum, or in six equal monthly installments.  (*Id.*)

## E. *Litigation Background*

Hometown filed a complaint in the District of Massachusetts against the Board, asserting seven counts under both federal and state law.  A January 6, 2009 Order dismissed all but one of the Plaintiffs' claims, leaving only Count V alleging a violation of Chapter 30A.  I then granted a motion by the Association to intervene in the action as a Defendant under FED. R. CIV. P. 24.

A hearing was held before me on April 29, 2009.  (Dkt. No. 46.)  At this hearing, when questions arose over how to determine the MNOI, Hometown contended as follows:

> Now, when you're in the MNOI regime, which is a different
> regime, because it caps the total income you can have,
> based on the 2006 level, that means, even though you can
> bring up units that are under the Settlement Agreement,
> which are vacated by the tenant, and you can bring up,
> let's say, one, two, three units, whatever number of
> units in a year, to the 515 level, that does not affect
> the bottom line. There is a -- there is a -- it's a zero
> sum situation set by MNOI, which is why, in the MNOI, it
> is absolutely critical to get the 2006 NOI to be fair,
> and one measurement of fair, and the only evidence that
> was before the Board, is that there is a 515, which was
> the -- which was the freely transacted number, back in
> 2006, and that there were these Settlement Agreements
> that were artificially depressing the rents in 2006. That
> was in the evidence before the Board.

In response to this contention, I requested Hometown to file supplemental briefing on whether MNOI had to be based on freely negotiated rents at the fall-back year; whether Hometown had made this argument in a timely fashion before the Board; and whether the Board acted inappropriately when it adopted a modified version of MNOI.  With supplemental submissions in hand, I turn to the core task before me, which is judicial review of the Board's rent adjustment decision, pursuant to Chapter 30A.

## II.   STANDARD OF REVIEW

The standard of review for agency decisions under Chapter 30A is laid out in Section 14, which makes judicial review available for "any person or appointing authority aggrieved by a final decision of any agency in an adjudicatory proceeding." MASS. GEN. LAWS ch. 30A, § 14.  Where no statutory form of judicial review is provided, the court confines its review to the administrative record filed by the agency, except "in cases of alleged irregularities in procedure before the agency, not shown in the record." *Id*. at § 14(5).  When reviewing an agency decision under Chapter 30A, the court must "give 'due weight to the experience, technical competence, and specialized knowledge' of the agency. . . . [and] exercise de novo review of questions of statutory construction." *In re McDonough's Case*, 858 N.E.2d 1084, 1086 (Mass. 2006) (quoting MASS. GEN. LAWS ch. 30A, § 14(7)).  A court must "overturn agency decisions that are not consistent with governing law." *Id.*

-17-

Under Section 14(6), a court can order that additional evidence be presented to the agency, if it is shown that "the additional evidence is material to the issues in the case, and that there was good reason for failure to present it in the proceeding before the agency." MASS. GEN. LAWS ch. 30A, § 14(6). Section 14(6) does not permit a party to present additional evidence, however, where "the record's shortcomings can be laid to [the moving party's] fault and neglect." *Fanion v. Dir. of Div. of Employment Sec.*, 464 N.E.2d 69, 71 (Mass. 1984).

Under Section 14(7), a court may affirm the decision, remand the matter for further proceedings, set aside or modify the decision, or compel actions unlawfully withheld or unreasonably delayed. MASS. GEN. LAWS ch. 30A, § 14(7). To take any such action, the court must determine that the "substantial rights of any party may have been prejudiced" because the agency decision was any of the following:

> (a) In violation of constitutional provisions; or
> (b) In excess of the statutory authority; or jurisdiction of the agency; or
> (c) Based upon an error of law; or
> (d) Made upon unlawful procedure; or
> (e) Unsupported by substantial evidence; or
> (f) Unwarranted by facts found by the court on the record as submitted or as amplified under paragraph (6) of this section, in those instances where the court is constitutionally required to make independent findings of fact; or
> (g) Arbitrary or capricious, an abuse of discretion, or otherwise not in accordance with the law.

*Id.*

### III.   ANALYSIS

As a prelude to judicial review, Plaintiffs have moved for leave to present additional evidence to the Board concerning Hometown's proposed rent adjustment, pursuant to Section 14(6) of Chapter 30A.  As to the substance of judicial review decision, Plaintiffs contend that the Board prejudiced Hometown's rights under Section 14(7).  I will address those issues in turn.

### A.   *Presentation of Additional Evidence Under Section 14(6)*

Under Section 14(6) of Chapter 30A, I must determine that the additional evidence sought to be proffered is material to the issue of a rent adjustment, and that there was good reason for Hometown's failure to present the evidence before the Board during the rent adjustment proceedings.

#### 1.   Materiality of the Evidence

Hometown claims that if the Board had permitted Hometown to present additional evidence on its 2006 NOI, that evidence would have included: a testimony of an appraiser or valuation expert on the market rents for the Leisurewoods units; a testimony of an accountant who would explain how to normalize base year expenses; a comparison of free market rents to those charged to the Property's tenants in 2006; a demonstration of the deviation from market rents that resulted from the settlement agreements; and a demonstration of the circumstances surrounding the negotiation of the long-term leases created by the settlement agreements.

-19-

Such evidence may indeed have been material to the issues before the Board concerning the proposed rent adjustment.  The By-law provides that the NOI in 2006, the year that rent control was instituted, will be presumed to be the park owner's FNOI. Neither the By-law nor the Board's Regulations state how this presumption could be rebutted, but rebuttal could conceivably be based on a showing that the base year's NOI does not reflect freely negotiated market rents.  With such a rebuttal, the Board might have a basis to consider making adjustments in the rent in order to provide the park owner with a more tailored NOI than that provided in the base year's NOI.

### 2.   Good Reason for Failure to Present the Evidence

In order to grant relief under Section 14(6), however, I must also determine that there was good reason for Hometown's failure to present the evidence to the Board during the evidentiary hearing.  Section 14(6) does not permit the presentation of additional evidence where the moving party had "ample opportunity to present evidence" at the agency hearing. *Fanion*, 464 N.E.2d at 71.

Given the language of the rent control regulations and the nature of the Board's proceedings, Hometown had ample opportunity to present evidence on the proper method for calculating the FNOI.  The By-law and Regulations clearly state that the park owner's NOI, in the year rent control was instituted, will be

presumed by the Board to be a FNOI.  Hometown had notice from this language that if it wanted to rebut this presumption, it had to demonstrate why its NOI in 2006 was not fair.  The factors that the Board could consider in order to determine the FNOI are wide-ranging and non-exclusive, and nothing in the statutory language precluded Hometown from presenting evidence at the outset on the nature of its rental revenue and operating expenses.

Nevertheless, Hometown's application employed a formula based only on gross rental revenue, without regard for the nature of the revenue or for its operating expenses.  It is unclear why Hometown would have assumed that gross rental revenue alone should be the basis for a rent adjustment, given the Regulations' focus on the FNOI and the Board's request for detailed reports on operating expenses.

During the public hearings in June 2008, when questions arose over how to determine the FNOI, Hometown declined to present evidence related to whether its net income in 2006 was "fair" for purposes of the By-law and Regulations.  Hometown's attorney stated during the public hearing that:

> If the Board wants something else, after your review,
> it's my understanding that, after you look at this, you
> determine the Fair Net Operating Income; not Mr. Adams,
> not the Tenants' Association and not my client; that's
> why we didn't do it.  I am not going to do your [the
> Board's] job because I shouldn't do your job.  That's not
> our function.  Our function is to come to this Board and
> ask for rent increase.

(AR 00185.)  Although the Board did not explicitly challenge
Hometown on its proposed formula during the evidentiary hearing,
it also did not instruct Hometown to limit its evidence in this
way.  Hometown chose for itself not to offer additional evidence
then at the administrative level.  It may not engage the court to
order now what it declined to do then.

**B.  *Judicial Review Under Section 14(7)***

Hometown identifies three sets of actions by the Board that
allegedly prejudiced Hometown's rights: (a) issuing a decision
using the MNOI methodology without notice and without hearing
Hometown's additional evidence on this methodology; (b) applying
the MNOI methodology in a manner that was not supported by
substantial evidence, was arbitrary and capricious, and was based
upon error of law; and (c) violating Hometown's right to a fair
return on its investment by failing to provide a return on its
capital expenditures.  I consider whether these actions satisfy
the conditions of Section 14(7), in order to determine whether
the requested judicial relief can be ordered.

1.  <u>Choice of Methodology</u>

Hometown maintains that the Board erred when it took
evidence on Hometown's proposed CPI formula, which multiplied the
CPI by the gross rental revenue in 2006, and then decided to
employ a different methodology once the Board met after the
public hearing.  This, according to Hometown, violated the

Plaintiff's procedural due process rights, which requires that "the affected individual . . . be forewarned and afforded an opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Amsden* v. *Moran*, 904 F.2d 748, 753 (1st Cir. 1990) (quoting *Armstrong* v. *Manzo*, 380 U.S. 545, 552 (1965)).  Hometown characterizes the Board's conduct as a "bait and switch," surprising Hometown with its choice of a MNOI methodology, without providing notice to the parties.

Hometown's objections to the Board's choice of methodology are not persuasive.  The Board simply applied the principles set forth in the Town's By-law and the Board's Regulations.  The By-law states that rent adjustments should guarantee that the park owner receives a "fair net operating income," not steady gross rental revenue.  (AR 00005.)  The Board's Regulations further provide that the Board, in determining the FNOI, can presume that the owner's total rents in 2006 were adequate at that time to provide the owner with a FNOI.  It is not uncommon for rent-controlled jurisdictions to base rent adjustments on the FNOI in a base year.  *See Quinn* v. *Rent Control Bd. of Peabody*, 698 N.E.2d 911, 924 (Mass. 1998) ("[T]he pass-through method [whereby the FNOI is calculated in a base year] is not new to the annals of rent control.").

Although the FNOI provision of the Regulations does not explicitly state that the owner can rebut the presumption that

-23-

the base year provided a FNOI, or describe the means for doing
so, the Regulations can reasonably be read to provide that such
rebuttal can occur when the owner petitions for a rent
adjustment.   Indeed, given the language of the Regulations, it is
unclear why Hometown chose to base its proposed rent adjustment
formula on gross rental revenue, rather than on net income.
Hometown did provide detailed figures regarding operating
expenses to the Board, but those amounts seem to have played no
role in Hometown's actual calculations for its proposed rent
increases.   Given the evidence provided by the parties at the
evidentiary hearing, I see no error in the Board's decision to
calculate net operating income in 2006 and to presume that this
was a fair return.

Furthermore, I find no error of law in the Board's refusal
to hear Hometown's late presentation of evidence on whether the
rents in 2006 differed from market rates at that time.   Hometown
had an opportunity to present this evidence at the public hearing
in June 2008; the language of the Board's Regulations provided
adequate indication of the issues relevant to a rent adjustment
determination.   In *Sniffin* v. *Prudential Ins. Co. of Am.*, 419
N.E.2d 308 (Mass. App. Ct. 1981), when the plaintiff alleged
violations of procedural due process, the court observed that
"[o]pportunity existed on two separate occasions before the board
for the landlord to present evidence to rebut the presumption

-24-

that the 1971 rents yielded a fair net operating income." *Id.* at 313.  Because such evidence was not presented at the administrative level, the court in *Sniffin* denied the plaintiff's request.  *Id.* at 313-14.  So too here.

2.  Application of the MNOI Methodology

Hometown next argues that the Board failed properly to apply the methodology that it did adopt, primarily because the Board wrongly assumed that the rents in 2006 were freely negotiated rents.  But Hometown itself used rental income in 2006 as the basis for its petition, without raising any issues as to the fairness of those income levels.  More importantly, Hometown does not demonstrate either that the Board believed the rents in 2006 to be "freely negotiated," or that a finding of the FNOI in a base year requires that the rents be freely negotiated.  The Board's Regulations merely state that the Board can presume that rents in a base year yield a FNOI; the Regulations make no mention of a presumption that rents in a base year have resulted from market conditions or unfettered negotiation.

The cases cited by Hometown do not hold differently.[7]  In *Marshal House, Inc.* v. *Rent Control Bd. of Brookline*, 266 N.E.2d

---

[7] While Hometown also relies on California case law, including *Trude Birkenfeld v. City of Berkeley,* 17 Cal. 3d 129 (Cal. 1976), for the proposition that the MNOI methodology requires adjustment of the base year rent if it does not approximate fair market rates, I find nothing in Massachusetts case law as prescriptive.

876 (Mass. 1971), the Supreme Judicial Court noted that the advantage of a provision that ties rents to a date before the enactment of rent control is that it sets rents "at levels which landlords and tenants had worked out for themselves by free bargaining in a competitive market." *Id.* at 886 (quoting *Hillcrest Terrace Corp.* v. *Brown*, 137 F.2d 663, 664 (Emer. Ct. App. 1943)).  To be sure, this comment applied to a different statute, and moreover was an observation rather than the case's holding.  Yet, while making that observation, the court held broadly that "we read the term 'fair net operating income,' as used in both statutes, to require that rents be set so as to assure to landlords a reasonable return on their investment" and did so without requiring incorporation of fair market value.  *Id.* at 888.  The same approach was subsequently adopted by the Appeals Court in *Niles v. Boston Rent Control Adm'*, 374 N.E.2d 296, 302 (Mass. App. Ct. 1978) ("neither the Supreme Judicial Court nor the United States Supreme Court has held that regulated rents must provide a fair return on the fair market value of property," rather the standard "is a 'fair net operating income,' or a 'fair return on . . . investment.'") (quoting *Marshal House*, 266 N.E.2d at 889).

Contrary to Hometown's allegations, the Board's application of the MNOI methodology is also consistent with *Quinn,* 698 N.E.2d 911*,* and *Jones* v. *Cambridge Rent Control Bd.,* No. CA924556D, 1993

WL 818565 (Mass. Super. Ct. Nov. 19, 1993).  While noting that
the FNOI methodology had the advantage of setting rents based on
"free bargaining in a competitive market," the court in *Quinn* did
not hold that rents derived from other conditions would fail to
qualify as FNOI.  698 N.E.2d at 924 (quoting *Marshal House*, 266
N.E.2d at 886).  For its part, the court in *Jones* explicitly
rejected an attempt to equate a fair investment return with a
market return.  1993 WL 818565, at *3 ("Neither the Act nor the
regulations promulgated thereunder guarantee or entitle a party
to a market return on its investment in the building," but they
"do require that rents be set so as to permit a fair net
operating income.").  While the *Jones* court ruled that it was not
arbitrary and capricious for the Board to adjust a rent-
controlled rate to approximate a market rent in some instances,
it did not hold that the Board was compelled to do so under the
law, in particular when plaintiff failed "to prove that the rents
set by the Board [we]re so low that it [wa]s 'impossible for an
efficient operator to stay in business or derive any profit
whatever.'"  *Id.* (quoting *Niles*, 374 N.E.2d at 303).

Finally, Hometown argues that its 2006 expenses were
abnormally high, a factor that was not considered by the Board in
its calculations.  The evidence on Hometown's operating expenses,
was, however, properly before the Board during its deliberations.
The Board members proceeded through the 2006 and 2007 expenses,

and had an opportunity to hear from Reed, the property manager, on the nature of the expenses and their variation over time. Moreover, the operating expenses listed for 2006 ($668,034.00) were actually less than those for 2007 ($684,078.00). (AR 00044.)

I conclude that the Board's determination of the FNOI and its application to Hometown's rent adjustment was in accordance with the law, and was supported by substantial evidence in the administrative record.

### 3. Treatment of the Capital Expenditures

Hometown's final complaint is that the Board's rent adjustment failed to provide Hometown with a reasonable return on its capital expenditures. Hometown's capital expenditures were $70,991 in 2005, $71,157 in 2006, and $83,690 in 2007. (AR 00056.) The Board decided that it would not allow Hometown to get a direct return on its capital improvements through rents; rather, in the expenses, the Board included the annual depreciation of Hometown's capital improvements. In its calculation of the 2006 NOI, the Board calculated operating expenses to include $4,744 in annual depreciation of capital improvements. For the 2007 rent adjustment, the Board calculated the 2007 operating expenses to include $5,831 in the depreciation of 2007 capital improvements. (AR 01084.) For the 2008 rent adjustment, the Board calculated 2008 expenses to include $6,173 for the 2008 depreciation. (AR 01085.)

Hometown argues that the Board's treatment of capital expenditures amounts to a deprivation of Hometown's substantive due process right to a return on its investment.  What Hometown overlooks, however, is that the Board's Regulations include a separate provision specifically designed to compensate park owners for their capital improvements.  While Sections 4 and 5 discuss the process by which a park owner petitions for an adjustment of the maximum rent it can charge its tenants, Section 7 provides for specific rent adjustments for capital improvements and capital equipment.  (AR 00015-19.)  Under this provision, a park owner can petition to obtain pre-approval for a rent increase to offset the costs of capital improvements.  (*Id.*)  The Town Counsel pointed this separate provision out during the deliberations, noting that the park owner can ask separately for recovery for capital improvements.  (AR 00629-30.)

The administrative record does not show that Hometown submitted a petition for recovery of and return on its capital improvements.  Hometown's rent adjustment petition was based solely on its gross rental revenue as adjusted by the CPI.  It provided data on capital improvements, but did not request a rent adjustment for these expenses, and did not discuss the conditions of Section 7.  Of course, if Hometown sought recovery for capital improvements that had been made in 2006 and 2007, before a Rent Control Board was operational and could hear such petitions, then

Hometown and the Board would have had to deviate from the pre-approval framework of Section 7.  But Hometown's petition makes no reference to a request for retroactive compensation for past capital improvements.

Hometown cites a Ninth Circuit holding that "every dollar the landlord puts into the property by way of capital improvements constitutes an investment in the property for which a 'fair and reasonable' return must be allowed."  *Sierra Lake Reserve* v. *City of Rocklin*, 938 F.2d 951, 958 (9th Cir. 1991), *vacated in part*, 506 U.S. 802 (1992), 987 F.2d 662 (9th Cir. 1993).  But the Board has not denied Hometown the opportunity to receive a fair return on its capital improvements, so long as it petitions the Board for the recovery in accordance with the Board's Regulations.

The other key cases cited by Hometown are inapposite in this regard.  The rent control approach discussed in *Quinn* was the MNOI method, maintaining a base year's NOI.  698 N.E.2d at 923-24.  When making a rent adjustment, both the current year's operating expenses and capital improvements were added to the FNOI.  *Id.* at 924.  As a result, capital improvements increased the maximum rent that could be charged, rather than decreasing it by being subtracted from rental revenue.  In *Sniffin*, the rent control board also permitted the owner to pass capital improvements expenses onto the tenants through rent increases.

419 N.E.2d at 311.  *Quinn* and *Sniffin* fail, however, to support Hometown's position for two reasons.  First, the boards' approaches in these cases do not contradict that taken by Rockland's Rent Control Board, which likewise permits owners to pass the costs of capital improvements to the tenants through a rent adjustment.  Second, the courts in *Quinn* and *Sniffin* did not hold that this approach was mandatory, only that it was acceptable under the statutory framework in question.

In sum, because Hometown has failed to establish that the Board's actions are contrary to the standards identified in Section 14(7)(a)-(g) of Chapter 30A, I conclude that Hometown is not entitled to judicial relief regarding the Board's rent adjustment decision.[8]

## IV.   CONCLUSION

For the reasons set forth more fully above, I DENY Plaintiffs' motion to present additional evidence to the Board and, upon judicial review of the administrative record, AFFIRM the Board's decision under Chapter 30A.  (Dkt. No. 31.)


**/s/ Douglas P. Woodlock**
DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT JUDGE

---

[8] In its supplemental briefing, Hometown now argues that, based on the doctrine of issue preclusion, it will suffer "irreversible constitutional injury" if this Court affirms the Board's decision with respect to its petitions for 2007 and 2008 rent adjustments.  It is by no means clear that principles of res judicata will obligate the Board to follow the same approach in calculating the FNOI in future years.  In any event, there is no demonstrated constitutional injury evident in the Board's determination before me.